[No. S072065. July 27, 1999.]

JOSE CARRILLO, Plaintiff and Respondent, v.
ACF INDUSTRIES, INC., Defendant and Appellant

**COUNSEL**

Horvitz & Levy, Ellis J. Horvitz, Barry R. Levy, Andrea M. Gauthier; Dwyer, Daly, Brotzen & Bruno, Ronald A. Dwyer, Toni Rae Bruno and Douglas W. Schroeder for Defendant and Appellant.

Mayer, Brown & Platt, Kenneth S. Geller, Alan E. Untereiner and Donald M. Falk for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Louis P. Warchot; Michael J. Rush; and Gloria W. Topping for Association of American Railroads as Amicus Curiae on behalf of Defendant and Appellant.

Fogel, Feldman, Ostrov, Ringler & Klevens, Jerome L. Ringler, Lester G. Ostrov, Toni Martinson and Jan G. Levine for Plaintiff and Respondent.

Eisen & Johnston, Jay-Allen Eisen, Marian M. Johnston; Mound, Cotton & Wollan, Ellen G. Margolis and Daniel Markewich as Amicus Curiae.

**OPINION**

**BROWN, J.**—Under the supremacy clause of the United States Constitution (art. I, § 8), do federal statutes specifying safety equipment on railroad freight cars preempt a state common law claim for tort damages based on allegedly defective design with respect to such equipment? The Court of Appeal determined federal law did not displace the state action. We conclude otherwise. As interpreted by the United States Supreme Court, the statutes and their implementing regulations reflect a congressional intent to occupy the field regulating railroad safety appliances, thus precluding any state law directed to the same matter, including common law tort claims predicated on design defects. Accordingly, we reverse the Court of Appeal.

FACTS

On June 30, 1992, plaintiff Jose Carrillo (plaintiff) was driving a truck for his employer, Amoco Chemical Company. He delivered a truckload of

polystyrene pellets to a hopper car—a type of boxcar equipped with roof hatches and funnel-like internal compartments in which small pieces of material can be stored and unloaded through a hinged door in the floor—owned by Wincup Holdings, Inc. The pellets were transferred from the truck to the roof hatches of the railcar by pumping them through a heavy steel hose. On the preceding day and for much of that day, Wincup employees did the actual work of transferring the pellets, using a rope to secure the steel hose to one of the car's roof hatches. Plaintiff operated the pump from his truck below.

Around noon, Wincup's employees told plaintiff they were leaving for lunch and would be back in about 30 minutes. They had not returned after half an hour, at which point he noticed pellets overflowing from the top of the railcar. He turned off the truck's pump motor and waited another 20 minutes. When Wincup's workers still had not returned, plaintiff decided to reposition the steel hose himself. Climbing a ladder to the top of the 15½-foot-high car, he untied the rope from the hatch and began to pull the steel hose from the car's interior. As he did so, the rope securing the hose came free, allowing the hose to hit him. Plaintiff spun backward and off the top of the car, struck a concrete wall alongside the track with both hands before hitting the ground, and sustained extensive wrist, leg and heel injuries.

Plaintiff filed this personal injury suit for tort damages against the railcar manufacturer, ACF Industries, Inc. (defendant), based on strict product liability theories of design defect and failure to warn. He asserted the top walkways on either side of the car's roof hatches were unsafe because they were not equipped with either a 3½-foot-high railing or a lower railing to which a lanyard and safety harness could be attached to secure a worker atop the car against falls. Neither the federal Safety Appliance Acts (collectively the SAA; see 49 U.S.C. § 20301 et seq.) nor its regulations (see 49 C.F.R. § 231 et seq. (1997)) require these features. Nor does the Federal Railroad Safety Act (FRSA; see 49 U.S.C. § 20101 et seq.).

Following trial, a jury awarded plaintiff $1.4 million in damages. Defendant sought a judgment notwithstanding the verdict on the ground that state tort remedies were preempted by the SAA and the FRSA. The trial court denied the motion. The Court of Appeal affirmed the judgment, holding that federal law did not preempt plaintiff's action because neither statute specifically addressed the subject of guardrails on hopper cars.

We granted defendant's petition for review and for the reasons that follow now reverse.

## DISCUSSION

■ Federal preemption "fundamentally is a question of congressional intent . . . ." (*English* v. *General Electric Co.* (1990) 496 U.S. 72, 78-79 [110 S.Ct. 2270, 2274-2275, 110 L.Ed.2d 65].) "Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, [citation], when there is outright or actual conflict between federal and state law, [citation], where compliance with both federal and state law is in effect physically impossible, [citation], where there is implicit in federal law a barrier to state regulation, [citation], where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, [citation], or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. [Citation.]" (*Louisiana Public Service Comm'n* v. *FCC* (1986) 476 U.S. 355, 368-369 [106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369].) In whichever circumstance the question arises, "we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citations.]" (*Medtronic, Inc.* v. *Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700] (*Medtronic*).) These principles apply with equal force whether the state law takes the form of a legislative enactment or an award of damages through private suit. (*San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 247 [79 S.Ct. 773, 780-781, 3 L.Ed.2d 775]; *Texas & Pacific Ry. Co.* v. *Rigsby* (1916) 241 U.S. 33, 41-42 [36 S.Ct. 482, 485, 60 L.Ed. 874]; see *Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 521 [112 S.Ct. 2608, 2620, 120 L.Ed.2d 407].)

The SAA, now set forth at 49 United States Code section 20301 et seq., constitutes a series of measures enacted between 1893 and 1910 intended to standardize regulations relating to freight-railcar safety devices for the benefit of workers and passengers. (See, e.g., *Illinois Central R.R. Co.* v. *Williams* (1917) 242 U.S. 462, 466-467 [37 S.Ct. 128, 129-130, 61 L.Ed. 437].) As early as 1915, the United States Supreme Court spoke to its preemptive effect. While as a general rule state and federal sovereignties may exercise concurrent jurisdiction and each penalize the same act, that principle "has no application where one of the governments has exclusive jurisdiction of the subject-matter, and therefore the exclusive power to punish. Such is the case here where Congress, in the exercise of its power to regulate interstate commerce, has legislated as to the appliances with which certain instrumentalities of that commerce must be furnished in order to secure the safety of employe[e]s. Until Congress entered this field, the States could legislate as to equipment in such manner as to incidentally affect without burdening interstate commerce. . . . Congress of course could have

'circumscribed its regulations' so as to occupy a limited field. [Citations.] But so far as it did legislate, the exclusive effect of the Safety Appliance Act did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employe[e]s." (*Southern Ry. Co.* v. *R.R. Comm., Indiana* (1915) 236 U.S. 439, 446 [35 S.Ct. 304, 305, 59 L.Ed. 661] (*Southern*).) In sum, "it is sufficient here to say that Congress has so far occupied the field of legislation relating to the equipment of [rail] freight cars with safety appliances as to supersede existing and prevent further legislation on that subject." (*Id.* at p. 447 [35 S.Ct. at p. 305].)

Shortly thereafter, the high court cited *Southern* in reiterating that "the United States has exercised its exclusive powers over interstate commerce so far as to take possession of the field [of rail safety appliances], [and thus] the States no more can supplement its requirements than they can annul them. [Citations.]" (*Penna. R. R. Co.* v. *Pub. Service Comm.* (1919) 250 U.S. 566, 569 [40 S.Ct. 36, 37, 63 L.Ed. 1142] (*Penna. R. R.*).) "So far as the safety equipment of [rail] vehicles is concerned, these Acts operate to exclude state regulation whether consistent, complementary, additional, or otherwise. [Citations.]" (*Gilvary* v. *Cuyahoga Valley Ry.* (1934) 292 U.S. 57, 60-61 [54 S.Ct. 573, 574, 78 L.Ed. 1123] (*Gilvary*); see also *Davis* v. *Manry* (1925) 266 U.S. 401, 404-405 [45 S.Ct. 163, 164, 69 L.Ed. 350].) As Justice Holmes succinctly explained, "The subject-matter in this instance is peculiarly one that calls for uniform law . . . ." (*Penna. R. R., supra,* 250 U.S. at p. 569 [40 S.Ct. at p. 37]; cf. *Transportation Union* v. *Long Island R. Co.* (1982) 455 U.S. 678, 687-688 [102 S.Ct. 1349, 1355-1356, 71 L.Ed.2d 547], fns. omitted ["Railroads have been subject to comprehensive federal regulation for nearly a century. . . . There is no comparable history of longstanding state regulation . . . of the railroad industry."].)

That insight is as true now as it was in the glory days of rail a century ago. In our modern rail system, individual freight cars are treated interchangeably as "free runners," traveling on continent-wide routes and multiple roads in an interstate system that knows no boundaries. "The country's railroads long ago abandoned the custom of shifting freight between the cars of connecting roads, and adopted the practice of shipping the same loaded car over connecting lines to its ultimate destination. The freight cars of the Nation thus became in essence a single common pool, used by all roads." (*United States* v. *Allegheny-Ludlum Steel* (1972) 406 U.S. 742, 743 [92 S.Ct. 1941, 1944, 32 L.Ed.2d 453]; *Southern Pacific Transp. Co.* v. *I.C.C.* (D.C. Cir. 1995) 69 F.3d 583, 585 [314 App.D.C. 419].) Standardization of safety devices is thus vital, and employees depend upon the certainty that at all times and in all weather conditions they "will find them in like place and of

like size and usefulness on all cars, from whatever line of railway or section of the country they may come." (*Illinois Central R.R. Co.* v. *Williams, supra,* 242 U.S. at p. 467 [37 S.Ct. at p. 129]; see also *Penna. R. R., supra,* 250 U.S. at p. 569 [40 S.Ct. at p. 37]; cf. 49 U.S.C. § 20302(b) [railroad carrier may refuse to receive vehicle from connecting carrier that does not comply with SAA].) Permitting state tort claims "would generate precisely those inconsistencies in railroad safety standards that Congressional action was intended to avoid." (*Ouellette* v. *Union Tank Car Co.* (D.Mass. 1995) 902 F.Supp. 5, 10.)

 Although the SAA does not expressly define "safety appliances," the determination whether a particular piece of equipment comes within its purview is a question of law. (See *Shields* v. *Atlantic Coast Line R. Co.* (1956) 350 U.S. 318, 322-325 [76 S.Ct. 386, 390-391, 100 L.Ed. 364] (*Shields*); *Hercules, Inc.* v. *Eilers* (Tex.Civ.App. 1970) 458 S.W.2d 221, 228-229.) "[A]s a practical matter, the central function of every device identified in the Act is safety: hand holds, running boards, hand brakes, automatic couplers, [and ladders]." (*Jordan* v. *Southern Ry. Co.* (4th Cir. 1992) 970 F.2d 1350, 1354 (*Jordan*); see 49 U.S.C. § 20302(a)(1); see also 49 C.F.R. § 231 et seq.) Since Congress "has so far occupied the field" (*Southern, supra,* 236 U.S. at p. 447 [35 S.Ct. at p. 305]), "the categories of safety appliances created by [the SAA] . . . should be broadly read to include every device falling within that category, even if the Secretary of Transportation has not seen fit to standardize a particular type or use of that device." (*Jordan, supra,* 970 F.2d at p. 1354.)

On this point, we find the analysis in *Shields, supra,* 350 U.S. 18, instructive. There, the plaintiff sustained injuries when a platform board attached to the dome of a tank car broke; the question was "whether this device, which for convenience we shall call a dome running board, is a safety appliance within the meaning" of the SAA. (*Shields, supra,* 350 U.S. at p. 319 [76 S.Ct. at p. 388].) Although regulations promulgated by the Interstate Commerce Commission did specify "in detail for one running board running around the perimeter, or at least the full length of the sides, of tank cars," neither the SAA nor the regulations made mention of "dome running boards." (*Id.* at pp. 320-321 [76 S.Ct. at p. 389], fn. omitted.) The Supreme Court did not find this conclusive. "[T]here is no showing that the regulations purport to exhaust by implication each category of statutory appliances listed in [the SAA]. Omission of dome running boards of itself shows no more than that the Commission has not standardized all possible running boards within the [SAA]." (*Id.* at p. 322 [76 S.Ct. at p. 390].) Instead, the court took a pragmatic approach and found that dome running boards served the same purpose and function as the running boards standardized in the regulations and that railroad employees considered them as such.

(*Id.* at p. 321 [76 S.Ct. at p. 389].) Given this parity, the court concluded they came within the meaning of "running boards" as used in the SAA. (*Ibid.*)

 Here, plaintiff asserts defendant should have incorporated a guard-rail in the design of its hopper car. Applying the analysis in *Shields*, such equipment plainly comes within the SAA. (Cf. *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238, 250-255 [104 S.Ct. 615, 622-625, 78 L.Ed.2d 443] (*Silkwood*) [field of nuclear safety regulation does not include remedies for violations, therefore state law actions not preempted].) Like handholds and grab holds, and even running boards and sill steps, guardrails allow a worker to maintain stable and secure footing while performing tasks on the railcar. Current regulations support this view. Although guardrails are not specified for hopper cars (see 49 C.F.R. §§ 231.1, 231.27, 231.28 (1997)), they are required on tank cars. (49 C.F.R. §§ 231.7(f), 231.8(h) (1997).) For tank cars with side platforms, they are an alternative to tank-head handholds. (49 C.F.R. § 231.7(e)(1).) Accordingly, we conclude the SAA precludes state regulation of guardrails on rail freight cars "whether consistent, complementary, additional, or otherwise" (*Gilvary, supra,* 292 U.S. at pp. 60-61 [54 S.Ct. at p. 574]) and thus preempts plaintiff's cause of action. (*Southern, supra,* 236 U.S. at p. 447 [35 S.Ct. at p. 305].)[1]

Plaintiff makes several arguments against this conclusion, none of which are persuasive. Citing language in *Atlantic Coast Line* v. *Georgia* (1914) 234 U.S. 280 [34 S.Ct. 829, 58 L.Ed. 1312] (*Atlantic*), he argues that *Southern, supra,* 236 U.S. 439, should be read narrowly to preempt only regulation of safety appliances expressly required by the SAA. *Atlantic* involved a state law prescribing a certain type of headlight for locomotives. To avoid this requirement, the defendant railroad invoked the SAA. Although the SAA regulated sill steps, hand brakes, ladders, running boards, and handholds, the Supreme Court found that "none of these acts provides regulations for locomotive headlights." (*Atlantic, supra,* 234 U.S. at p. 293 [345 S.Ct. at p. 832].) It thus determined Congress had not intended "to supersede the exercise of the State's police power with respect to this subject . . . ." (*Id.* at p. 294 [34 S.Ct. at p. 833].)

We are unconvinced *Atlantic* controls our interpretation of *Southern*. First, it would appear locomotive headlights could not reasonably be classified with any of the safety appliances enumerated in the SAA. (See *Southern,*

---

[1]This conclusion extends to plaintiff's failure-to-warn claim as well. "As for warning requirements, these too are within the scope of the [Secretary of Transportation's] authority—an authority which the Secretary has often invoked. [Citations.]" (*Law* v. *General Motors Corp.* (9th Cir. 1997) 114 F.3d 908, 911.)

*supra*, 236 U.S. at p. 446 [35 S.Ct. at p. 305] [citing *Atlantic* as a case in which Congress has occupied a "limited field"].) Neither the statute nor the regulations referred to lights of any type or any comparable equipment. By contrast, guardrails are plainly safety appliances by virtue of both their function and the regulatory agency's designation. Moreover, the Supreme Court in *Southern* chose to speak expansively and categorically regarding congressional intent to occupy the field: " '[T]he legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject-matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it . . . the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed.' " (*Southern, supra*, 236 U.S. at p. 447 [35 S.Ct. at p. 305].) Plaintiff's contrary theory that the SAA preempts only the limited class of devices expressly enumerated conflates field preemption with conflict preemption. (See *id.* at p. 448 [35 S.Ct. at p. 306].)

In a similar vein, plaintiff contends that in *Terminal Assn.* v. *Trainmen* (1943) 318 U.S. 1, 4-5 [63 S.Ct. 420, 422, 87 L.Ed. 571] (*Terminal*), the Supreme Court clarified it intended a narrow holding in *Penna. R. R., supra*, 250 U.S. 566. In *Terminal*, state law required the provision of caboose cars for railroad employees performing terminal services. As in *Atlantic*, this did not involve a matter addressed either by Congress or the Interstate Commerce Commission. (*Terminal, supra*, 318 U.S. at p. 4 [63 S.Ct. at p. 422]; see also *Atlantic, supra*, 234 U.S. at pp. 293-294 [34 S.Ct. at pp. 832-833].) In other words, it did not implicate regulation of any safety appliance.

Plaintiff also cites *Napier* v. *Atlantic Coast Line Railroad Co.* (1926) 272 U.S. 605 [47 S.Ct. 207, 71 L.Ed. 432]. In that case, state laws prohibited use of locomotives not equipped with automatic doors to fireboxes to protect railroad firemen from exposure to extremes of heat and cold and cab curtains to shield engineers and firemen against winter weather. The Supreme Court found the requirements preempted under the Boiler Inspection Act, which "extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." (*Id.* at p. 611 [47 S.Ct. at p. 209]; see 49 U.S.C. § 20701 et seq.) In passing, the court found no preemption under the SAA, "since its requirements are specific." (*Ibid.*) Plaintiff would read this observation out of context. The court made the statement in reference to the question, "Does the legislation of Congress manifest the intention to occupy the entire field of regulating locomotive equipment?" (*Ibid.*) The regulations at that time required that interstate locomotives be equipped with a variety of devices. (See *id.* at pp. 608-609 & fn. 1 [47 S.Ct. at p. 208]; but see 49 U.S.C. § 20302(a)(4) [current version of

SAA addresses only locomotive brakes].) None, however, concerned any equipment relating to the working conditions of engineers or firemen. This distinction in coverage—reflecting congressional intent—would account for the court's conclusion the SAA did not preempt state law. (See also *Atlantic*, *supra*, 234 U.S. at pp. 293-294 [34 S.Ct. at pp. 832-833].) Plaintiff's unduly narrow reading also disregards the teachings of *Southern*, *Penna. R. R.*, and *Gilvary*.

Plaintiff notes that in *Rucker* v. *Norfolk & W. Ry. Co.* (1979) 77 Ill.2d 434 [33 Ill.Dec. 145, 396 N.E.2d 534], involving a design defect tort action for failure to equip a railroad tank car with a protective "headshield," the Illinois Supreme Court found "no indication in the Federal regulations that the preemption of State tort law was intended [despite the presence of Federal regulations on the subject]." (*Id.* at p. 440 [396 N.E.2d at p. 537].) We are unpersuaded by this conclusory preemption analysis. (See *Ouellette* v. *Union Tank Car Co.*, *supra*, 902 F.Supp. at p. 11.) In our view, the *Rucker* court failed to account for the guiding principles articulated in *Southern* and *Penna. R. R.*[2]

Nor does *Silkwood*, *supra*, 464 U.S. 238, or *Medtronic*, *supra*, 518 U.S. 470, assist plaintiff's position. He argues these decisions "demonstrate[] the anti-preemption stance taken by the Supreme Court in recent years." In actuality, and consistent with our interpretation of the SAA, they simply illustrate the proper application of three interrelated principles of the pre-emption doctrine: that courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear manifest purpose of Congress" (*Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447]); that preemption "fundamentally is a question of congressional intent" (*English* v. *General Electric Co.*, *supra*, 496 U.S. at pp. 78-79 [110 S.Ct. at p. 2275]); and that "whether Congress and its commissions acting under it have so far exercised the exclusive jurisdiction that belongs to it as to exclude the State, must be answered by a judgment upon the particular case." (*Penna. R. R.*, *supra*, 250 U.S. at p. 569 [40 S.Ct. at p. 37].)

In *Medtronic*, the high court confronted an express preemption provision contained in the Medical Device Amendments of 1976 (MDA), which the

---

[2]Other decisions plaintiff relies on are distinguishable: In each instance, the court found that the equipment in question did not come within any of the categories of devices set forth in the SAA. (See *Moses* v. *Union Pacific R.R.* (8th Cir. 1995) 64 F.3d 413, 418 [pull plate]; *Jordan*, *supra*, 970 F.2d at p. 1354 [door and ratchet mechanism]; *Hercules, Inc.* v. *Eilers*, *supra*, 458 S.W.2d at p. 299 [dome lid].) In both *Jordan* and *Hercules*, the courts reached their conclusions applying the analysis in *Shields*, *supra*, 350 U.S. 318. (*Jordan*, *supra*, 970 F.2d at pp. 1353-1354; *Hercules, Inc.* v. *Eilers*, *supra*, 458 S.W.2d at pp. 228-299.)

defendant contended preempted a state common law negligence action for manufacturing an allegedly defective medical device. The court first rejected the argument the statute precluded all common law claims. "If Congress intended such a result, its failure even to hint at it is spectacularly odd, particularly since Members of both Houses were acutely aware of ongoing product liability litigation." (*Medtronic, supra*, 518 U.S. at p. 491 [116 S.Ct. at p. 2253], fn. omitted.) With respect to the plaintiffs' specific claims, the court also found no preemption under the MDA or its implementing regulations. "Unlike the statute construed in *Cipollone*, for instance, pre-emption under the MDA does not arise directly as a result of the enactment of the statute; rather, in most cases a state law will be pre-empted only to the extent that the [federal Food and Drug Administration] has promulgated a relevant federal 'requirement.' " (*Id.* at p. 496 [116 S.Ct. at p. 2255].) No such "requirement" applied to the device in question; therefore, the state action was permitted. (*Id.* at pp. 496-497 [116 S.Ct. at p. 2256].)

Here, we have a case of field preemption, which by definition means congressional intent generally extends beyond the express terms of the statute and regulations to all aspects coming within their contemplation. (*Southern, supra*, 236 U.S. at pp. 446-447 [35 S.Ct. at p. 305].) Like the other devices itemized in the SAA, guardrails are safety appliances, which the designated regulatory authority has prescribed for some railcars and not for others. This determination leaves no place for state common law actions, "consistent, complementary, additional, or otherwise." (*Gilvary, supra*, 292 U.S. at p. 61 [54 S.Ct. at p. 574].)

In *Silkwood*, the heir of a nuclear laboratory worker brought state law tort claims for strict liability and negligence based on the decedent's excessive exposure to plutonium. The jury verdict in favor of the plaintiff included an award of punitive damages, which the defendant contended was precluded under the Atomic Energy Act. After a careful examination of the statutory and regulatory scheme, the Supreme Court found a contrary congressional intent. (*Silkwood, supra*, 464 U.S. at pp. 250-255 [104 S.Ct. at pp. 622-625].) By subsequent enactment of the Price-Anderson Act, Congress "assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies." Considering the historical record, "[t]his was true even though Congress was fully aware of the [Nuclear Regulatory] Commission's exclusive . . . authority over safety matters." (*Id.* at pp. 252-253 [104 S.Ct. at p. 624].) Thus, while federal law controlled the formulation of nuclear safety standards (see *id.* at pp. 250-251 [104 S.Ct. at p. 622]), state law compensation remained available in the event of radiation accidents. (*Id.* at pp. 251-252 [104 S.Ct. at p. 623].)

In contrast, the SAA contains no evidence Congress assumed or intended state remedies for design defects would be preserved. Given the goal of

national uniformity, allowing such claims would substantially impair its function. As Judge Kozinski expounded in *Law* v. *General Motors Corp.*, *supra*, 114 F.3d at pages 910-911: "Apart from compensating victims of accidents for their injuries, the purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state. [Citation.] A railroad equipment manufacturer found to have negligently designed a braking system, for example, is expected to modify that system to reduce the risk of injury. If the manufacturer fails to mend its ways, its negligence may be adjudged willful in the next case, prompting a substantial punitive damages award. If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Either way, Congress's goal of uniform, federal railroad regulation would be undermined. [Citation.]" (Cf. *Gade* v. *National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 103 [112 S.Ct. 2374, 2385, 120 L.Ed.2d 73] [" 'A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal.' [Citation.]"].)

This observation suggests an additional concern considering the national dimension of rail transportation. Should safety requirements imposed by individual states conflict, they could create an unconstitutional burden on interstate commerce. (See, e.g., *Bibb* v. *Navajo Freight Lines* (1959) 359 U.S. 520 [79 S.Ct. 962, 3 L.Ed.2d 1003]; *Southern Pacific Co.* v. *Arizona* (1945) 325 U.S. 761 [65 S.Ct. 1515, 89 L.Ed. 1915].) "A State which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate [transporters] entering or crossing its territory." (*Bibb* v. *Navajo Freight Lines*, *supra*, 359 U.S. at pp. 529-530 [79 S.Ct. at p. 968].) Absent uniform federal standards for safety appliances, such potential is inherent in the "free runner" system by which freight cars are readily interchanged throughout the country.[3]

CONCLUSION

"The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory

---

[3]The Court of Appeal also held plaintiff's common law tort judgment was not preempted by the FRSA. The House report accompanying the bill that became the FRSA noted that "[o]ver the years there have been several enactments . . . dealing with certain phases of railroad safety," including the "Safety Appliance Acts, Signal Inspection Acts, Ash Pan Act, Locomotive Inspection Act, Accidents Report Act, and the Hours of Service Act." (1970 U.S. Code Cong. & Admin. News, at p. 4105.) "These particular laws have served well," the report concluded; "[i]n fact the committee chose to continue them without change." (*Ibid.*) Because Congress continued the SAA intact and unmodified within its historic regulatory area, our conclusion as to its preemptive effect is not affected by passage of the FRSA. Since the SAA preempts plaintiff's tort claim, we have no occasion to consider whether the FRSA does also.

power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or . . . Congress has unmistakably so ordained." (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248].) Because the SAA "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" (*Rice* v. *Santa Fe Elevator Corp.*, *supra*, 331 U.S. at p. 230 [67 S.Ct. at p. 1152]), we find both of these grounds present in this case, where plaintiff's cause of action is based upon an alleged defective design of a railcar for failure to include a safety appliance not prescribed by the statute or its implementing regulations.[4]

## Disposition

The judgment of the Court of Appeal is reversed and the matter remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I dissent.

I disagree that Jose Carrillo's claims for injuries sustained when he fell from the top of a hopper car unequipped with guardrails were preempted by the Safety Appliance Acts (hereafter SAA), 49 United States Code sections 20301 to 20306 or the Federal Railroad Safety Act (hereafter FRSA), 49 United States Code section 20101 et seq. The regulations under the SAA make no mention of the particular safety appliances at issue here—protective guardrails on the top of hopper cars—that would have prevented Carrillo's fall. Nor do the regulations under the FRSA. As the Court of Appeal correctly held, where the federal regulations are silent concerning the use of

---

[4]Our holding applies only to the narrow facts before us; we do not determine the SAA's preemptive effect with respect to any other types of action. We note that under the Federal Employers' Liability Act of 1908 (45 U.S.C. § 51 et seq.) an injured railroad employee may bring a cause of action without proof of negligence based on failure of the SAA-mandated safety appliances to function. (See *Crane* v. *Cedar Rapids & I. C. R. Co.* (1969) 395 U.S. 164, 166 [89 S.Ct. 1706, 1708, 23 L.Ed.2d 176]; cf. *A. T. & S.F. Ry.* v. *Scarlett* (1937) 300 U.S. 471, 474 [57 S.Ct. 541, 543, 81 L.Ed. 748] [strict liability applies only when injurious safety appliance is clearly within SAA].) When such strict liability does not apply, i.e., the injury does not result from defective equipment covered by the SAA, the employee must establish common law negligence. (See *Jordan*, *supra*, 970 F.2d at p. 1354.) The Supreme Court has also recognized that the SAA imposes a duty on railroads extending to nonemployee travelers at railway/highway crossings (see *Fairport R. Co.* v. *Meredith* (1934) 292 U.S. 589, 597 [54 S.Ct. 826, 829, 78 L.Ed. 1446]), who must bring a common law tort action in state court (absent diversity) and must prove negligence. (*Crane* v. *Cedar Rapids & I. C. R. Co.*, *supra*, 395 U.S. at p. 166 [89 S.Ct. at p. 1708].)

particular safety devices, there is no preemption of state common law claims.

The majority conclude that Congress intended to so occupy the field of railway "safety appliances" as to preempt all state common law tort claims for damages. Not so. Since the SAA was enacted, between 1883 and 1910, *no United States Supreme Court or lower federal court decision in point has ever so held*: in each case where the SAA was found to preempt state law, it was because the particular safety device at issue was specifically enumerated in federal regulations. With regard to the FRSA, Congress expressly protected the right of states to regulate railroad safety as to matters not covered by federal regulation.

Ignoring the strong presumption against preemption of state law, the majority rely on isolated dicta and broad generalities—what they call "guiding principles"—about the "vital" need for national standards in this area. In my view, the better "guiding principles" in this area support the conclusion that when the SAA has *not* spoken, *safety* comes first.

## I

The factual and procedural background are as follows.

In June 1992, Carrillo, a truck driver for Amoco Chemical Company, was delivering pellets of polystyrene to Wincup Holdings, Inc. (hereafter Wincup). The pellets were transferred from his truck through a heavy steel hose into the top of a hopper car operated by Wincup. The hopper car was 15½ feet high; its top constitutes a work platform and has 2 walkways on each side. It is completely open and has no guardrails.

During the delivery, Carrillo and Wincup employees used a rope to lift the truck's hose to the top of the hopper car, where it was inserted into a hatch. The Wincup employees left the area, saying they would return in 30 minutes, and Carrillo began pumping the delivery into the car. After about 30 minutes, Carrillo noticed that the material was coming out of the top of the car. Unable to locate any Wincup employees, he shut off the pump. When they did not return after another 20 minutes, he climbed to the top of the hopper car to adjust the hose. He stood over the hatch and bent over to untie the rope that was attached to the hatch and hose. As he lifted the hose, it began sliding down the side of the car. The rope came free from the hose and Carrillo fell backwards off the top of the car. He hit the wall of a building with both hands and then fell to the ground. He sustained serious injuries to his wrist, leg, and heel, requiring extensive surgeries.

Carrillo sued Wincup for negligence and ACF Industries, Inc. (hereafter ACF Industries) for negligence, breach of warranty, and products liability. Wincup settled. During trial, Carrillo dismissed all causes of action except for those based on products liability, including design defect and failure to warn. He contended that the hopper car should have been equipped either with a 42-inch guardrail, retractable or stationary, or with a lower railing to which a lanyard and safety harness could be attached. He also claimed that the design for harnessing should have been accompanied by a sign warning workers not to work on top of the car without such "fall protection."

The jury, by special verdict, found that there had been both design defect and a failure to warn and awarded economic and noneconomic damages. After adjustments based on the jury's assessment of comparative fault, the total judgment against ACF Industries was $1,429,274.13.

ACF Industries appealed on the ground, inter alia, that the common law tort claims were preempted by federal laws regulating railroad safety. The Court of Appeal affirmed. It concluded that Congress did not act to broadly preempt the field of "safety appliances"; the SAA and FRSA bar common law relief only with respect to the equipment they have specifically enumerated. Because there is no provision in the SAA or FRSA regulating the use of guardrails on hopper cars, there is no preemption of Carrillo's claims.

We granted review. I would now affirm.

## II

In *Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504 [112 S.Ct. 2608, 120 L.Ed.2d 407], the United States Supreme Court summarized the law of preemption as follows.

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' [U.S. Const., art. VI, cl. 2.] Thus, since our decision in *McCulloch* v. *Maryland* [(1819) 17 U.S. (4 Wheat.) 316, 427 [4 L.Ed. 579]], it has been settled that state law that conflicts with federal law is 'without effect.' [Citation.] Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' [Citation.] Accordingly, ' "[t]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis. [Citation.]

"Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' [Citation.] In the absence

of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, [citation], or if federal law so thoroughly occupies a legislative field ' "as to make reasonable the inference that Congress left no room for the States to supplement it." ' " (*Cipollone* v. *Liggett Group, Inc., supra*, 505 U.S. at p. 516 [112 S.Ct. at p. 2617].)

In *CSX Transp., Inc.* v. *Easterwood* (1993) 507 U.S. 658, 668 [113 S.Ct. 1732, 1739-1740, 123 L.Ed.2d 387], a case involving preemption of common law tort claims involving railroad safety, the United States Supreme Court referred to the "presumption *against* pre-emption." (Italics added.) "In the interest of avoiding unintended encroachment on the authority of the States . . . a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." (*Id.* at pp. 663-664 [113 S.Ct. at p. 1737].) The federal law must do more than " 'touch upon' " or " 'relate to' " the subject matter of relevant state law; preemption will lie only if the federal regulations "substantially subsume" that subject matter (*Id.* at p. 664 [113 S.Ct. at p. 1738].) The court also specifically rejected the argument, echoed here, that the " 'hit-or-miss common law method' " of enforcing state common law standards, runs counter to the federal laws, observing that "the scheme of negligence liability could just as easily complement [the] regulations." (*Id.* at p. 668 [113 S.Ct. at p. 1739].)

ACF Industries contends that the common law tort claims in this matter are preempted by two sets of federal laws concerning railroad safety: the SAA and FRSA. The former contains no express preemption language; ACF Industries argues, however, that it is implied. The latter contains an express preemption provision, section 20106 of title 49 of the United States Code, which provides, in relevant part, that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement."[1]

I address the two points in turn.

With regard to the SAA, Carrillo's claim is preempted only if it may fairly be implied either that the SAA was intended by Congress to occupy the entire field of railroad safety appliances or, more narrowly, that existing

---

[1] In the case of a particular subject matter covered by such federal regulation, "A state may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order— [¶] (1) is necessary to eliminate or reduce an essential local safety hazard; [¶] (2) is not incompatible with a law, regulation, or order of the United States Government; and [¶] (3) does not unreasonably burden interstate commerce." (49 U.S.C. § 20106.)

regulations concerning guardrails on hopper cars actually conflict with state law. Neither is the case.

The SAA states specific requirements for the use of particular safety devices on railroad cars. These include secure sill steps and hand brakes, ladders and running boards, roof handholds or grab irons at the top of ladders, side and end handholds or grab irons for security in coupling. (49 U.S.C. § 20302(a)(1), (2).) Nothing on the face of the statutory scheme, which provides for a narrow list of equipment for certain types of railroad cars, indicates that Congress intended to occupy the entire field of safety equipment for railroad cars. Nor does the majority point to any legislative history suggesting a broader purpose.

Review of relevant Supreme Court decisions going back to the beginning of the century confirms that the SAA does not have preemptive effect when the federal law is silent about a particular safety feature.

*Atlantic Coast Line* v. *Georgia* (1914) 234 U.S. 280 [34 S.Ct. 829, 58 L.Ed. 1312] (*Atlantic*) involved a claim by the plaintiff railroad that a Georgia statute requiring locomotives to be equipped with headlights was preempted by the SAA and other federal provisions. The high court disagreed. Enumerating the specific requirements of the federal provisions, including the SAA and the regulations thereunder, it explained: "[I]t is manifest that none of these acts provides regulations for locomotive headlights. . . . As to these, the situation has not been altered by any exertion of Federal power . . . . The most that can be said is that . . . Congress has not yet decided to establish regulations, either directly or through its subordinate body, as to the appliance in question. The intent to supersede the exercise of the State's police power with respect to this subject cannot be inferred from the restricted action which thus far has been taken." (*Id.* at pp. 293-294 [34 S.Ct. at pp. 832-833].)

Subsequently, in *Napier* v. *Atlantic Coast Line* (1926) 272 U.S. 605 [47 S.Ct. 207, 71 L.Ed. 432] (*Napier*), the Supreme Court considered the validity of state laws requiring that locomotives be equipped with firebox doors and cab curtains. As in *Atlantic*, the court enumerated the federal requirements under the SAA and other provisions, observing that the regulations under the SAA did not specifically address these appliances. With regard to preemption, it stated, as relevant here: "The intention of Congress to exclude States from exerting their police power must be clearly manifested. [Citations.] Does the legislation of Congress manifest the intention to occupy the entire field of regulating locomotive equipment? *Obviously it did not do so by the Safety Appliance Act, since its requirements are specific.*" (272 U.S. at p. 611

[47 S.Ct. at p. 209], italics added.) *Napier* expressly distinguished the preemptive scope of the then recently amended Boiler Inspection Act (BIA, presently the Locomotive Inspection Act, 49 U.S.C. § 20701 et seq.), concluding that its provisions were intended to occupy the general field of locomotive health and safety appliances. (272 U.S. at p. 613 [47 S.Ct. at p. 210].)

Consistent with *Napier*, the Supreme Court has limited the application of the SAA's strict liability provisions to claims involving specific devices enumerated by its regulations. Thus, in *A. T. & S.F. Ry.* v. *Scarlett* (1937) 300 U.S. 471, 475 [57 S.Ct. 541, 543, 81 L.Ed. 748], it held that because the injurious design of a brace rod on the side of a railcar was not covered under the SAA, the plaintiff could recover damages only in an action for common law negligence. In *Jordan* v. *Southern Ry. Co.* (4th Cir. 1992) 970 F.2d 1350, the Fourth Circuit Court of Appeals, following *Napier*, explained: " 'Safety appliance' is a popular name given to the statute and the equipment it treats; however, the statute nowhere defines a generic class of 'safety appliances.' Instead, the statute contains a strikingly specific laundry list of equipment a railroad must have on each type of car: ladders, brakes, automatic couplers, hand holds, running boards, etc." (*Id.* at p. 1352; accord, *Moses* v. *Union Pacific R.R.* (8th Cir. 1995) 64 F.3d 413, 418 ["[T]he FSAAs do not extend to devices not enumerated in [the SAA]."])[2]

The majority purport to rely instead on *Penna. R.R. Co.* v. *Pub. Service Comm.* (1919) 250 U.S. 566 [40 S.Ct. 36, 63 L.Ed. 1142] (*Penna.*) to support their conclusion that the SAA is preemptive. Referring to dicta in *Penna.* to the effect that the safety of railroad rolling stock is a subject matter that "is peculiarly one that calls for uniform law" (250 U.S. at p. 569 [40 S.Ct. at p. 37]), they urge that any lesser standard than complete preemption in this area would be unworkable. The actual holding in *Penna.*, however, was far more limited, addressing a direct conflict between state and federal law about particular safety requirements. Specifically, it held that the absence of a rear platform, rails, and steps on a mail car could not be the basis for a state law penalty because federal regulations under the SAA both regulated those cars and permitted them without such equipment. Nor has the Supreme Court endorsed such a sweeping view of *Penna.* Thus, in *Terminal Assn.* v. *Trainmen* (1943) 318 U.S. 1 [63 S.Ct. 420, 87 L.Ed. 571], the Supreme Court held that neither the SAA nor the BIA preempted a state requirement for cabooses in the absence of federal regulations on the subject matter, noting that, if enacted, such regulations would be controlling: "This and no more is the effect of [*Penna.*]." (*Id.* at pp. 4-5 [63 S.Ct. at p. 422].)

---

[2]State courts have similarly held that the SAA preempts state law only when there is a direct conflict. (See, e.g., *Rucker* v. *Norfolk & W. Ry. Co.* (1979) 77 Ill.2d 434, 440 [33 Ill.Dec. 145, 396 N.E.2d 534, 537]; *Apache Ry. Co.* v. *Shumway* (1945) 62 Ariz. 359, 370 [158 P.2d 142, 147].)

The majority also point to dicta in *Southern Ry. Co.* v. *R.R. Comm., Indiana* (1915) 236 U.S. 439, 447 [35 S.Ct. 304, 305, 59 L.Ed. 661] (*Southern*) to the effect that "Congress has so far occupied the field of legislation relating to the equipment of freight cars with safety appliances as to supersede existing and prevent further legislation on that subject." *Southern*, too, involved the preemptive effect of specific regulations under the SAA concerning grab irons and handholds. In that context, the language relied upon by the majority, rather than referring to the general class of safety appliances, would appear to refer *only to safety appliances specified by the SAA*. Such a conclusion finds support in the court's previous decision in *Atlantic, supra*, 234 U.S. 280, and is confirmed by its subsequent decision in *Napier, supra*, 272 U.S. 605.

*Texas & Pacific Ry. Co.* v. *Rigsby* (1916) 241 U.S. 33 [36 S.Ct. 482, 60 L.Ed. 874], cited by appellant, also does not support preemption. *Rigsby* held that a worker injured because of a defective handhold or grab iron had a strict right of recovery under the SAA—which specifically regulated those safety appliances—and that such right could not be limited by state law doctrines such as negligence. This case, too, offers no support for the majority's conclusion that Congress intended to preempt the broad subject of "safety appliances" in general.

Nor does the existence of regulations concerning guardrails on tank cars necessarily preempt state regulation of guardrails on *all* types of rail freight cars, as the majority incorrectly conclude. Their reliance on *Shields* v. *Atlantic Coast Line R. Co.* (1956) 350 U.S. 318 [76 S.Ct. 386, 100 L.Ed. 364] for this proposition is misplaced. *Shields* involved an action by an independent contractor for absolute liability against the railroad for injuries caused by a defective running board located on the dome of a tank car. The United States Supreme Court concluded that, for the purposes of such an action, a "dome running board" came within the meaning of the term "running boards" as used in a provision of the SAA requiring "secure running boards" on certain freight cars. (*Id.* at pp. 321-323 [76 S.Ct. at pp. 389-390].) While it is undoubtedly true that guardrails on a hopper car, like guardrails on a tank car, *would* constitute a "safety appliance"—and that any federal regulations concerning their use would be preemptive *if* they existed—the dispositive point for our purposes is that *guardrails are not specified for hopper cars*. There can be no preemption in the absence of any regulation in this area.[3]

Turning briefly to the FRSA, as discussed, it contains an express preemption provision. (49 U.S.C. § 20106.) As discussed, it provides that states may

[3]The majority also warn, in dicta, that safety requirements imposed by individual states might create an unconstitutional burden on interstate commerce. No such question was raised here; nor are we called upon to speculate about hypothetical constitutional violations. Moreover, the fact that Congress expressly permits the state regulation of matters relating to

adopt or continue regulation of matters relating to railroad safety until the Secretary of Transportation "prescribes a regulation or issues an order covering the subject matter of the State requirement." (*Ibid.*)

The Supreme Court has held that "pre-emption [under the FRSA] will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." (*CSX Transp., Inc.* v. *Easterwood, supra*, 507 U.S. at p. 664 [113 S.Ct. at p. 1737].) Carrillo's claim is thus preempted only if the Secretary of Transportation has adopted regulations that "cover[] the subject matter" of guardrails and warnings on hopper cars. None of the items required by the federal regulations cover or duplicate the types of safety measures Carrillo alleged were required.

Defendant urges that the existence of regulations concerning safety railings on tank cars (49 C.F.R. §§ 231.7(f), 231.8(h) (1977)) signifies, by negative implication, that there is no such requirement for hopper cars. Not so. The regulations concerning tank cars do not cover fall protection measures concerning hopper cars—a different kind of railroad car. *There are no regulations concerning fall protection on the top of hopper cars.* (See *id.*, §§ 231.2, 231.4, 231.5 [listing safety regulations concerning hopper cars].) Because of the lack of specific provisions covering the safety devices at issue here, there was no preemption: the regulations do not address, and therefore cannot "substantially subsume" the subject matter of Carrillo's tort claims.

### III

Congress has not expressed, or implied, an intention to preempt the entire undefined field of railroad safety appliances. Carrillo's claims involve particular safety appliances on hopper cars that are not the subject of any federal regulations. The majority's conclusions to the contrary find no support in the SAA, the FRSA, or decisions of the United States Supreme Court. Accordingly, I dissent.

---

railroad safety under the FRSA, so long as it does not unreasonably burden interstate commerce (49 U.S.C. § 20106), strongly undercuts any implication that it will inevitably, or even likely, do so.