■ Jeffrey Feldman, Appellant, v CSX Transportation, Inc., et al., Respondents, and General Electric Railcar Corporation, Sued Herein as General Electric Rail Services Corp., Defendant and Third-Party Plaintiff-Respondent. Pure Tech APR et al., Third-Party Defendants-Appellants. [821 NYS2d 85]—

In an action to recover damages for personal injuries, the plaintiff appeals, as limited by his brief, from so much of an order of the Supreme Court, Kings County (Barasch, J.), dated October 19, 2004, as granted those branches of the separate motions of the defendant and third-party plaintiff, the defendants CSX Transportation, Inc., and New York & Atlantic Railway Company, and the defendant Trinity Industries, Inc., which were for summary judgment dismissing the complaint insofar as asserted against them, and denied his cross motion for summary judgment on the complaint, and the third-party defendants separately appeal, as limited by their brief, from so much the same order as granted that branch of the motion of the defendant third-party plaintiff which was for summary judgment on its third-party cause of action for contractual indemnification, and denied their cross motion for summary judgment dismissing the third-party complaint.

Ordered that the order is affirmed insofar as appealed from with one bill of costs to the defendants CSX Transportation, Inc., and New York & Atlantic Railway Company, and the defendant Trinity Industries, Inc., appearing separately and filing separate briefs payable by the plaintiff, and one bill of costs to the defendant and third-party plaintiff payable by the third-party defendants.

In 2001 the plaintiff was employed as a production manager by the third-party defendant Pure Tech APR, a division of the third-party defendant Plastic Specialties and Technologies, Inc. (hereinafter collectively Pure Tech). The plaintiff's duties included inspecting railcars before they were loaded to ensure that the railcars were free of items that could contaminate Pure Tech's plastic products during transportation. To accomplish this task, the plaintiff was required to climb to the roof of the railcar.

The particular railcar at issue is a covered hopper car. This covered hopper car, which was designed and manufactured by the defendant Trinity Industries, Inc. (hereinafter Trinity), and owned by the defendant and third-party plaintiff, General Electric Railcar Services Corporation, sued herein as General Electric Rail Services Corp. (hereinafter GE Rail), is approximately 15 feet high and has a longitudinal row of hatches running down the center of the roof. The running boards on this type of covered hopper car contain no safety guardrails, and the roof contains no attachments for safety harnesses or lanyards.

In 1999 Pure Tech entered into an agreement with GE Rail, which was renewed in 2001, to lease, inter alia, the covered hopper car at issue. Before the plaintiff's accident, in response to Pure Tech's request, the defendant CSX Transportation, Inc. (hereinafter CSX), hauled the hopper car to a location where the defendant New York & Atlantic Railway Company (hereinafter NYARC) took possession of the car and hauled the car the rest of the way to NYARC's rail freight facility in Pinelawn, near Pure Tech's East Farmingdale facility.

On October 29, 2001, the plaintiff was injured in the course of inspecting the covered hopper car, when he allegedly lost his balance and fell off a running board on the roof of the car. He commenced this action against GE Rail, CSX, NYARC, and Trinity for strict products liability based on theories of design defect and failure to warn, and negligence based on a violation of the Federal Safety Appliance Act (49 USC § 20301 *et seq.*) (hereinafter the SAA). He alleged that the covered hopper car was defective and unsafe since it was not equipped with safety guardrails connected to the running boards, or warning labels instructing workers of the dangers of climbing to the roof of the car. He also asserted Labor Law claims against NYARC. GE Rail thereafter commenced a third-party action against Pure Tech for contractual indemnification based on the 1999 lease agreement.

After discovery, the defendants moved, inter alia, for summary judgment dismissing the complaint insofar as asserted

against them, and the plaintiff cross-moved for summary judgment on the complaint. GE Rail's motion also sought summary judgment on its third-party cause of action for contractual indemnification and Pure Tech cross-moved for summary judgment dismissing the third-party complaint. The Supreme Court granted summary judgment dismissing the plaintiff's products liability claim and negligence claim as preempted by the SAA and the Federal Railroad Safety Act (hereinafter the FRSA). The court further concluded that the covered hopper car design did not violate the SAA as a matter of law. The court also granted summary judgment dismissing the Labor Law claims and granted that branch of GE Rail's motion which was for summary judgment on its third-party cause of action for contractual indemnification against Pure Tech. The plaintiff appealed and Pure Tech separately appealed. We affirm.

Under the Supremacy Clause of the United States Constitution (US Const, art VI, [2]), state law may be preempted in three circumstances: first, through express statutory language; second, when it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively; and third, when it actually conflicts with federal law (*see English v General Elec. Co.,* 496 US 72, 79 [1990]). Preemption is fundamentally based on Congressional intent, which can be inferred from "a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject' " (*id.,* quoting *Rice v Santa Fe Elevator Corp.,* 331 US 218, 230 [1947]; *see CSX Transp., Inc. v Easterwood,* 507 US 658, 663 [1993]). Yet, when the field alleged to be preempted is traditionally occupied by the States, preemption must be a clear and manifest purpose of Congress (*see CSX Transp. v Easterwood, supra*; *Napier v Atlantic Coast Line R. Co.,* 272 US 605, 611 [1926]). In other words, the Federal statute must substantially subsume the subject matter of the relevant state law (*see CSX Transp. v Easterwood, supra* at 664).

In our opinion, Congress intended the SAA to preempt state products liability claims based on theories of design defect or failure to warn when the plaintiff alleges that the railcar design is defective due to the failure to include certain safety appliances or instructions not prescribed by the statute or regulations of the Federal Railroad Administration (hereinafter FRA), promulgated pursuant to the FRSA (*see* 49 CFR Part 231). The

purpose of the SAA is to protect employees and the public from injuries due to defective railroad appliances (*see Baltimore & Ohio R. Co. v Jackson,* 353 US 325, 329 [1957]). Its provisions are specific as to the safety equipment required for railcars, including the location, dimensions, number, and specifications of the same (*see generally* 49 USC § 20302). Generally, the SAA does not require railcars to have warning labels or handrails attached to a car's running boards (*see* 49 USC § 20302 [a] [1] [C]).

The United States Supreme Court first defined the scope of SAA preemption in 1915, in *Southern R. Co. v Railroad Comm'n of Ind.* (236 US 439 [1915]), holding that Congress has sought to occupy the entire field relating to railcar safety appliances and that the SAA supercedes any state legislation on that subject (*id.* at 446). The Court avowed that the states could not legislate to require "greater or less or different equipment" (*id.*). Since 1915, Federal courts have consistently held that "as far as the safety equipment of such vehicles is concerned, these acts operate to exclude state regulation whether consistent, complementary, additional or otherwise" (*Gilvary v Cuyahoga Valley R. Co.,* 292 US 57, 60-61 [1934]; *see e.g. Pennsylvania R. Co. v Public Serv. Comm'n of Pa.,* 250 US 566, 569 [1919] [state statute requiring greater safety requirements than that promulgated in the SAA was preempted]).

The progeny of *Southern R.* includes a California Supreme Court case which is on point. In *Carrillo v ACF Indus.* (20 Cal 4th 1158, 980 P2d 386 [1999], *cert denied* 528 US 1077 [2000]) the plaintiff was injured when he fell off a running board of a covered hopper car identical in design to the car at issue herein. His claims were based on the failure of the car to have safety railings attached to the running boards or labels warning of the dangers. The California Supreme Court concluded that the plaintiffs were preempted by the SAA since Congress intended to dominate the entire safety appliance field (20 Cal 4th at 1169, 980 P2d at 393). The court averred that a products liability claim would undermine Congress' goal of national uniformity since manufacturers would have to sell cars whose equipment could be changed at each state line due to each state's adoption of different liability-triggered standards (20 Cal 4th at 1169, 980 P2d at 393; *see Law v General Motors Corp.,* 114 F3d 908, 910-911 [1997]). The court further noted that guardrails are safety appliances that Congress prescribed for some railcars and not for others (20 Cal 4th at 1168, 980 P2d at 392; *see* 49 CFR 231.7 [f] [tank cars]).

Here, the plaintiff alleged in his strict products liability claim

based on theories of design defect and failure to warn that the hopper car was unsafe since it was not equipped with a safety guardrail attached to the running boards, it contained no attachments for safety harnesses or lanyards, and it contained no warning labels or instructions for climbing the car. In our opinion, the federal interest in the safety appliance field is so dominant that the federal system precludes enforcement of these claims which, in effect, seek to regulate the field by requiring greater safety equipment in New York than that required by the SAA and its implementing FRA regulations. Accordingly, the plaintiff's strict products liability claim is preempted under the circumstances of this case.

However, contrary to the defendants' contentions, the plaintiff's negligence claim is not preempted by the SAA to the extent that it seeks to enforce the federal regulations. The plaintiff's negligence claim is based on the defendants' alleged violation of the SAA and FRA regulations. The SAA provides a duty to strictly comply with its regulations, and the right to recover damages sustained from a breach of that duty springs from the common law (*see Gilvary v Cuyahoga Valley R. Co.,* supra at 61; *Moore v Chesapeake & Ohio R. Co.,* 291 US 205, 214-215 [1934]; *see also Atchison, T. & S.F. R. Co. v Scarlett,* 300 US 471, 474 [1937]). Thus, a violation becomes negligence per se (*see O'Donnell v Elgin, J. & E. R. Co.,* 338 US 384, 390-391 [1949]). Consequently, the Federal Employers' Liability Act (45 USC § 51 *et seq.*) (hereinafter the FELA) creates an independent cause of action for federal employees injured due to a violation of SAA (*see Crane v Cedar Rapids & Iowa City R. Co.,* 395 US 164, 166 [1969]). Yet, while a railroad employee may assert a federal claim under the FELA, a nonrailroad employee must look for a remedy in a common-law tort action since he or she has no federal cause of action available (*see Roth v I & M Rail Link, L.L.C.,* 179 F Supp 2d 1054 [2001]). As a result, the United States Supreme Court has declared that issues such as causation, contributory negligence, and assumption of risk are left to state law (*see Crane v Cedar Rapids & Iowa City R. Co.,* supra at 167). Thus, to the extent that the plaintiff's negligence claim seeks to enforce the SAA safety provisions, rather than regulate the safety appliance field, it is not preempted by the SAA.

In any event, the Supreme Court properly dismissed the plaintiff's negligence claim as a matter of law. The plaintiff makes two assertions to support his negligence claim: first, the design of the covered hopper car is in violation of the SAA and FRA regulations since it has two running boards along the outer

edges of the car, instead of one running board down the center of the car as required by 49 CFR 231.1; and second, the running boards are not "secure" since they are unsafe.

Pursuant to FRA regulations supplementing the SAA, "box and other house cars with roof hatches" are required to have "[o]ne longitudinal running board" which runs the "[f]ull length of [the] car [down the] center of [the] roof" (49 CFR 231.1 [c] [1], [3]; 231.2; 231.4; 231.24; 231.28 [a]). When a car is not covered specifically by one of the FRA provisions, including the number, location, and dimension of running boards, CFR 231.18 provides that such a car may be considered a "[c]ar . . . of special construction, but shall have, as nearly as possible, the same complement of handholds, sill steps, ladders, hand brakes, and running boards as are required for cars of the nearest approximate type" (49 CFR 231.18).

Contrary to the plaintiff's contention, the interpretation of a federal regulation is an issue of law, not fact, and is reviewed de novo (see Penta v Related Cos., 286 AD2d 674, 675 [2001]; Anderson v Rochester-Genesee Regional Transp. Auth., 337 F3d 201, 207 [2003]; United States v Mitchell, 328 F3d 77, 81 [2003]). Here, we conclude that the covered hopper car is a car of special construction since it is not specifically covered by FRA regulations, the covered hopper car most closely approximates a box or other house car with roof hatches (see Illinois Cent. Gulf R.R. Co. v International Paper Co., 824 F2d 403, 404 [1987] ["(h)opper cars resemble boxcars"]), and the covered hopper car design meets "as nearly as possible" the requirement that all box cars with roof hatches have one running board down the center of the car (49 CFR 231.18, 231.1 [c] [1], [3]).

We find the rationale in the FRA letter ruling submitted in support of the defendants' motions for summary judgment to be persuasive. The letter ruling, drafted by Daniel C. Smith, the Assistant Chief Counsel of the Safety Law Division of the FRA, provides in pertinent part that: "In FRA's opinion, the car which is specifically covered by Part 231 that most nearly approximates the hopper car described above is a 'box or other house car with roof hatches.' Such cars are addressed in both Section 231.1 and Section 231.28, depending upon the date on which the car was built or placed in service; however, both sections generally rely on Section 231.1(c) for running board specifications. See 49 CFR 231.28(a). The running board specifications contained in that paragraph require that the running board span the entire length of the car and be located in the center of the car. See 49 CFR 231.1(c)(3). Due to the design of a hopper car with center roof hatches, it cannot physically meet

this requirement as the hatches are located in the center of the roof. Consequently, FRA believes that the placing of a running board on each side of the roof for the entire length of the roof meets *as nearly as possible* the requirement of Section 231.1(c)(3) based on the design of the car involved."

Although letter rulings such as the one at bar are not entitled to deference as defined in *Chevron U.S.A., Inc. v Natural Resources Defense Council, Inc.* (467 US 837 [1984]) and are not conclusive as to an interpretation of a regulation or standard which binds a court's process, they are persuasive (*see Christensen v Harris County,* 529 US 576, 587 [2000]; *Skidmore v Swift & Co.,* 323 US 134, 140 [1944]). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control" (*Skidmore v Swift & Co., supra* at 140).

Here, the FRA's reasoning was valid and thoroughly considered in light of the flexibility for compliance provided in the regulations. Notably, CFR 231.18 does not require that a car of special construction comply exactly with the car type it most approximates. Rather, it must only comply "as nearly as possible." Here, the running boards for the hopper car design, which notably is the design employed for approximately 208,000 cars, 94% of the covered hopper cars presently in service, cannot physically be located down the center of the car because the hatches are located down the center of the car. The interpretation that such a design complies as nearly as possible with the box car requirements is not irrational or inconsistent with the regulations since center line hatches provide for more uniform loading and more consistent balance for the railcars (*see Bowles v Seminole Rock & Sand Co.,* 325 US 410, 414 [1945]; *Taylor v Vermont Dept. of Educ.,* 313 F3d 768, 780 [2002]; *Dixson v Burlington N. R.R. Co.,* 795 F Supp 939, 940 [1992]; *see also Matter of Blossom View Nursing Home v Novello,* 4 NY3d 581, 594-595 [2005]). Moreover, the running boards comply with all other requirements prescribed in CFR 231.1. Thus, we conclude that the location of two running boards along the outside of the center line complies as nearly as possible with FRA regulations.

Additionally, the plaintiff failed to raise a triable issue of fact as to his second basis for his negligence claim—that the running boards were not "secure" since they were unsafe. Under the SAA and FRA regulations, running boards are required to be securely fastened to the car (*see* 49 USC § 20302 [a] [1] [C]; 49 CFR 231.1 [c] [4] [iii]). In arguing that the running boards at

issue were in violation of the SAA, the plaintiff asserts that "secure" means "safe." The plaintiff's reliance on *Shields v Atlantic Coast Line R. Co.* (350 US 318 [1956]) to support this proposition is misplaced. In *Shields,* it was undisputed that the dome running boards at issue were defective. The United States Supreme Court concluded that the dome running boards had to comply with the requirements that running boards be secure, stating that "it must be a safe board as required by section [20302 of the SAA]" (*id.* at 324). Contrary to the plaintiff's contention, the United States Supreme Court did not conclude that the term "secure" under the SAA was defined as "safe." Rather, the court concluded that the dome running board was unsafe because it was not secured properly (*id.*). Indeed, the US Court of Appeals for the Ninth Circuit concluded in *Collins v Southern Pac. Co.* (286 F2d 813 [1961], *cert denied* 366 US 923 [1961]) that the presence of grease on a grab iron did not violate the SAA since the statute required a "secure" grab iron, not a "safe" grab iron. The Ninth Circuit noted that there was no contention that the grab iron at issue was not securely fastened to the car or structurally defective (*id.* at 814; *see also Raudenbush v Baltimore & O. R. Co.,* 160 F2d 363, 365-366 [1947] [secure sill under the SAA did not mean free of ice and snow, it meant securely fastened]).

Similarly, here, the plaintiff makes no contention that the running boards were not securely fastened to the hopper car or were structurally defective. Nor is there any evidence in the record to support this contention. Therefore, in opposition to the defendants' prima facie showing, the plaintiff failed to raise a triable issue of fact as to whether the running boards were securely fastened to the car.

With respect to GE Rail's third-party cause of action for contractual indemnification, the Supreme Court properly determined that Pure Tech was obligated to indemnify GE Rail for its reasonable attorney's fees and costs. Pursuant to the 1999 lease agreement between GE Rail and Pure Tech, Pure Tech was obligated to indemnify GE Rail for "any losses, liabilities, expenses (including without limitation, the reasonable cost of investigating and defending against any claim for damages) . . . in connection with . . . the use . . . of the Car." Under Illinois Law, which was the parties' choice of law in the lease agreement, the indemnity clause is unambiguous (*see Dowd & Dowd v Gleason,* 693 NE2d 358, 368 [1998]), and the plaintiff's inspection of the car before it was loaded was clearly performed in connection with the use of the car (*see Northern States Co. v A. Finkl & Sons Co.,* 132 NE2d 59, 60-61 [1956]).

Therefore, a plain reading of the indemnification clause obligates Pure Tech to indemnify GE Rail for reasonable attorney's fees and costs.

The plaintiff's and Pure Tech's remaining contentions are without merit or need not be considered in light of our determination. Adams, J.P., Goldstein, Luciano and Spolzino, JJ., concur.