[996 NYS2d 466]

GOOD SAMARITAN HOSPITAL MEDICAL CENTER INC., as Operator of the GOOD SAMARITAN NURSING HOME, et al., Petitioners, v NEW YORK STATE DEPARTMENT OF HEALTH et al., Respondents.

Supreme Court, Suffolk County, July 23, 2014

### APPEARANCES OF COUNSEL

*Ward Greenberg Heller & Reidy LLP*, Rochester (*Thomas S. D'Antonio* and *William R. Leinen* of counsel), for petitioners.

*Eric T. Schneiderman, Attorney General*, Hauppauge (*Patricia M. Hingerton* of counsel), for respondents.

### OPINION OF THE COURT

JEFFREY ARLEN SPINNER, J.

It is ordered that the application of petitioners is hereby denied in all respects.

Petitioners move this court for an order, pursuant to article 78 of the CPLR, annulling respondents' determination, dated June 20, 2011, and petitioners' rates set thereby; directing respondents Department of Health (DOH) and Shah to delete all reserved bed days from the calculation of petitioners' Medicaid rates, as well as the calculations used in setting pricing

for direct or indirect patient care services on a regional or statewide basis; directing respondents DOH and Shah to recalculate petitioners' Medicaid rates using appropriate numbers of Medicaid patient days that do not include reserved bed days; directing respondent Megna to approve such recalculated rates; together with costs and disbursements of this proceeding, plus attorney fees and expenses, pursuant to the Equal Access to Justice Act and all related authority.

## Statement of Facts

Petitioners consist of three different nursing homes operated as part of the Catholic Health Services of Long Island network (petitioners), which collectively contain 790 beds and provide a full range of nursing home and health-related services to Suffolk County, New York residents.

Petitioners receive reimbursement for eligible patients by Medicaid, which is a joint federal-state program established pursuant to title XIX of the Social Security Act (42 USC § 1396 *et seq.*), which pays for medical care for those otherwise unable to afford it, including nursing home care for elderly people with low incomes and limited assets. The federal government typically covers 50% of New York's Medicaid costs, while state and local governments share responsibility for the remainder. New York operates its own Medicaid program, setting its own guidelines for eligibility and services, in conformity with federal statutes, regulations and rules.

The reimbursement rate that a facility may bill Medicaid for eligible residents is governed by Public Health Law § 2807, which was expressly enacted to implement a Medicaid reimbursement system in compliance with the requirements of title XIX of the Social Security Act (42 USC § 1396 *et seq.*). In response to skyrocketing medical costs that were consuming taxpayer funds at an alarming rate, the New York State Legislature amended Public Health Law § 2807 in 1969 by what is known as the Hospital Cost Control Law (*see* L 1969, ch 957). Through that amendment, the legislature altered the criteria for establishing the reimbursement rates for various medical services, from rates "reasonably related to the costs of providing such service" (Public Health Law former § 2807 [3], as added by L 1965, ch 795, § 1), to rates "reasonably related to the costs of efficient production of such service" (Public Health Law former § 2807 [3], as amended by L 1969, ch 957, § 4; *see People v Woman's Christian Assn. of Jamestown*, 56 AD2d 101,

103 [1977]). In enacting this change, the legislature expressly stated "that it is essential that an effective cost control program be established which will both enable and motivate hospitals to control their spiraling costs" (L 1969, ch 957, § 2; *see People v Woman's Christian Assn. of Jamestown*, 44 NY2d 466, 474 [1978]).

The legislature once again amended the operative language of Public Health Law § 2807 (3) in 1982 (L 1982, ch 536, § 3) and currently requires the Commissioner of Health to establish reimbursement rates for payments to hospitals for hospital and health-related services that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" (Public Health Law § 2807 [3]).

In scheduling rates that complied with this statutory standard, the Commissioner developed and implemented the Resource Utilization Group-II case mix reimbursement methodology, effective January 1, 1986 (*see* 10 NYCRR subpart 86-2; *Matter of Blossom View Nursing Home v Novello*, 4 NY3d 581 [2005]). As the Court of Appeals has noted, this reimbursement methodology, designed to comport with the standard set forth in Public Health Law § 2807 (3), represented "a key cost containment device that encourages facilities to economize," and replaced a prior methodology which, inconsistent with the purpose of the standard set forth in Public Health Law § 2807 (3), "saddled taxpayers with ever-increasing expenditures without creating any incentives for efficiency" (*see Matter of Nazareth Home of the Franciscan Sisters v Novello*, 7 NY3d 538, 544 [2006]).

Indeed, Public Health Law § 2807 (3) "does not require rates to cover every [provider's] actual costs . . . . Rates are 'reasonable and adequate' so long as they reimburse the necessary costs (i.e., the 'costs which must be incurred') of 'efficiently and economically operated facilities' " (*id.* at 546, quoting Public Health Law § 2807 [3]).

The legislature's strong concern for efficiency makes it unmistakably clear that their express intent in passing Public Health Law § 2807 (3) was to control the spiraling cost of Medicaid services consuming taxpayer dollars at a rate that was both burgeoning and mind-boggling.

A New York State agency, respondent DOH is vested with the authority, pursuant to article 28 of the Public Health Law, to establish Medicaid reimbursement rates for nursing homes using

the Resource Utilization Group-II case mix reimbursement methodology (*see* 10 NYCRR subpart 86-2; *Matter of Blossom View Nursing Home v Novello*). Simply put, a nursing home's per diem reimbursement rate, the daily rate at which a facility can bill Medicaid for every Medicaid-eligible resident, reflects a facility's allowable costs divided by the number of "patient days." Allowable costs in a base year are adjusted to reflect patient conditions and care needs, as well as regional differences in wages and fringe benefits, and are then trended forward to account for the effects of inflation.

The Commissioner adopted this rate-setting methodology in order to encourage nursing homes both to contain costs and operate efficiently and economically in line with their reimbursement rates. Rates are set in advance of the rate year, and are subject to a maximum (ceiling) and minimum (base) amount derived from statewide averages (*see Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326 [1995]).

In 2006, the legislature added a new subdivision (2-b) to Public Health Law § 2808, which provides for updating the base year for operating costs beginning as of January 1, 2007 (*see* L 2006, ch 109, § 1, part C, § 47). This new provision mandated full implementation in 2009, preceded by a two-year phase-in period, and called for a 2002 base year. Further, Public Health Law § 2808 (2-b) (f) specified updating thereafter no later than the 2012 rate period, using a base year no earlier than three years prior to the initial rate year, and for subsequent updating at least every six years, again using a three-year-old or more recent base year. This amendment, referred to as the Rebasing Law, constituted a significant change to Medicaid rate-setting for nursing homes.

In the instant matter, the controversy revolves around the Medicaid rate-setting practices utilized by respondent DOH to reimburse petitioners, subsequent to the introduction of the Rebasing Law. In particular, the distinction between the Medicaid per diem reimbursement rate for "reserved bed patient days" and "patient days" has resulted in the filing of the instant petition.

The controlling regulation, 10 NYCRR 86-2.8 (d), states simply that "reserved bed patient days" shall be computed separately from "patient days."

A "reserved bed patient day" is defined as "the unit of measure denoting an overnight stay away from the residential

health care facility for which the patient, or patient's third-party payor, provides per diem reimbursement when the patient's absence is due to hospitalization or therapeutic leave" (10 NYCRR 86-2.8 [d]). A "patient day" is defined as "the unit of measure denoting lodging provided and services rendered to one patient between the census-taking hour on two successive days" (10 NYCRR 86-2.8 [a]).

On June 20, 2011, respondent DOH sent petitioners a Dear Administrator Letter containing an updated determination of the Medicaid per diem reimbursement rates petitioners would receive for all periods on and after April 1, 2009. The rate sheets included all "reserved bed patient days" within the number of "patient days" used to calculate their Medicaid per diem reimbursement rates.

The updated per diem reimbursement rate reflected a facility's allowable costs divided by the number of both "patient days" and "reserved patient days." The result was that respondent DOH effectively closed a loophole that petitioners utilized to improperly increase the per diem reimbursement rates that Medicaid paid them.

Petitioners have been fully compensated for "reserved bed patient days" at all times prior and subsequent to April 1, 2009. In other words, each and every time that petitioners set aside a bed for a temporarily absent patient, Medicaid has always fully reimbursed petitioners for all of the costs associated with each bed that petitioners have set aside for these patients. Such reimbursement appears to have resulted in a windfall for petitioners.

The updated DOH determination allows petitioners to continue to be fully compensated for each and every "reserved bed patient day" but precludes petitioners from artificially increasing the Medicaid per diem rate that respondent DOH pays them by also simultaneously reimbursing petitioners for that bed as a "patient day" as well.

The updated determination that respondent DOH sent to petitioners foreclosed a technicality that petitioners had exploited so as to obtain unjust, unreasonable and excessive compensation, at the expense of the federal government, New York State government, Suffolk County government, Medicaid and, even more importantly, ultimately at the expense of hard-working taxpayers, in clear violation of established public policy.

## Standard of Review

It is well settled that, in reviewing administrative action, a court may not substitute its judgment for that of the agency responsible for making the determination, but must ascertain only whether there is a rational basis for the decision or whether the determination is arbitrary and capricious (*see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 231, 232 [1974]). Deference to the judgment of the agency, when supported by the record, is particularly appropriate when the matter under review involves a factual evaluation in the area of the agency's expertise (*see Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]; *Matter of Warder v Board of Regents of Univ. of State of N.Y.*, 53 NY2d 186, 194 [1981]).

DOH is entitled to a "high degree of judicial deference, especially when . . . act[ing] in the area of its particular expertise," and thus petitioners bear the "heavy burden of showing" that DOH's rate-setting methodology "is unreasonable and unsupported by any evidence" (*see Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326, 331, 332 [1995]).

## Legal Analysis

### I. Granting Petitioners the Relief That They Request Violates Public Policy

Granting petitioners the requested relief, forcing respondent DOH to change the manner in which the government agency calculates the Medicaid per diem rate, will provide petitioners with a continuing financial windfall because petitioners will be compensated in two distinctly different ways for reserving beds for absent patients: Petitioners will be fully reimbursed for "reserved bed patient days" and petitioners will also receive a higher Medicaid per diem rate.

Were respondent DOH required to compensate petitioners in two distinctly different ways for reserving beds for absent patients, this requirement would violate public policy for a number of reasons.

Granting petitioner the requested relief violates public policy because it would result in a double recovery for petitioners. It follows then that such double recovery costs would ultimately be borne by the tax-paying public through increased taxation. Public policy requires that New York State, respondent DOH and Medicaid utilize their limited resources in the most efficient

and productive manner possible. Compensating petitioners in two distinctly different ways for not filling an empty bed is neither an efficient nor productive use of very finite governmental resources.

It is a clear public policy violation to allow petitioners to recover in two distinctly different ways when petitioners are engaging in work requiring a minimal allocation of their own resources. When petitioners reserve beds for absent patients, petitioners do not need to pay any costs associated with supplies (i.e., food, linens) that cannot be given to absent patients and utilities such as water and electricity that absent patients cannot utilize.

When petitioners reserve a bed for an absent patient, petitioners simply leave a bed open and are therefore required to spend less capital on maintaining a reserved bed as opposed to maintaining an occupied bed. Petitioners ask this court to compensate them in two distinctly different ways for reserving beds for absent patients, although petitioners actually save more capital by reserving a bed for an absent patient as opposed to tending to a patient in an occupied bed.

It also defies all logic to allow petitioners to recover in two distinctly different ways for performing less work, requiring a smaller allocation of resources and capital.

Thus, the most efficient, fair and reasonable manner in which to allocate highly limited governmental resources in the instant situation is to continue to pay petitioners for reserving beds for absent patients, but refraining from paying petitioners a higher Medicaid per diem rate. This solution allows for the most optimally efficient use of vital governmental resources. This solution further creates the most efficient and reasonable outcome for taxpayers, in addition to the federal, state and local governments.

II. Granting Petitioners the Requested Relief Violates Public Health Law § 2807 (3)

Since Public Health Law § 2807 (3) does not require per diem Medicaid rates to cover petitioners' actual costs, but only petitioners' "necessary costs," respondent DOH need only compensate petitioners the necessary costs that they incur reserving beds for absent patients. Thus, pursuant to Public Health Law § 2807 (3), respondent DOH is required to pay petitioners for reserving beds for absent patients but nothing more.

Granting petitioners the requested relief simultaneously contradicts and openly defies the legislature's intent in passing Public Health Law § 2807 (3) because paying petitioners to reserve beds for absent patients and also paying petitioners a higher Medicaid per diem rate for those same reserved beds is an appallingly inefficient use of governmental resources. The legislature's intent in passing the aforesaid statute was to contain the rising costs associated with compensating the health care industry. Rather than containing costs, as mandated by the statute, paying petitioners in two distinctly different ways for reserving beds for absent patients serves to exacerbate the aforementioned problem.

Finally, there is absolutely no authority in Public Health Law § 2807 (3), either express or implied, supporting petitioners' contention that respondent DOH is required to pay petitioners both their necessary costs and a higher per diem Medicaid reimbursement rate. If anything, Public Health Law § 2807 (3) clearly supports respondent DOH and its vital need to cease paying arbitrary and unreasonable expenses to health care facilities. Requiring respondent DOH to pay a higher per diem Medicaid rate in addition to paying petitioners necessary costs contradicts the plain language of Public Health Law § 2807 (3).

III. Petitioners Failed to Provide Expert Testimony to Substantiate Their Claims

Petitioners argue that the controlling regulation means "reserved bed patient days" should be calculated separately from "patient days" when determining Medicaid per diem reimbursement rates (petitioners' mem at 9-11). Yet, petitioners fail to provide *any* expert testimony whatsoever to support this position. Petitioners simply make and repeat conclusory, unsupported statements regarding *their* belief as to what the controlling regulation means.

Petitioners also fail to demonstrate the manner in which they claim that respondent DOH's rate-setting methodology "is unreasonable and unsupported by *any* evidence." More specifically, petitioners never even contest the expert testimony respondents set forth by way of the affidavit of Alfred Fargione (see infra) in their quest to demonstrate that said rate-setting methodology is arbitrary, capricious or lacking a rational basis.

On the other hand, respondents forcefully argue that "reserved bed patient days" should be calculated together with "patient days" when determining Medicaid per diem reimbursement rates for nursing homes. In support of their argument,

respondents provide extensive evidence in the form of expert testimony from Alfred Fargione, Chief Health Care Fiscal Analyst, Bureau of Long Term Care Reimbursement, New York State Department of Health. Therein, Fargione provides substantial evidence demonstrating that the reimbursement rates respondent DOH set for petitioners are reasonable, adequate and rational.

Respondents correctly contend that the controlling regulation merely serves to distinguish the number of "reserved bed patient days" from "patient days" so as to allow respondent DOH to track the statistics of reserved bed days being billed and paid for (Fargione aff ¶ 23). To support this contention, respondents provide annual cost report forms that DOH supplies to nursing homes, referred to as the RHCF-4 (respondents mem at 10; Fargione aff, exhibits C, D, E, F, G). Respondents provide RHCF-4 forms from 1976, 1982, 1992, 2002 and 2011. All of these reports clearly show that respondent DOH has consistently determined "reserved bed patient days" as being merely a subset of "patient days."

Petitioners never address the substantial amount of probative evidence that the Fargione affidavit brings to light. Petitioners simply ignore this important and highly relevant affidavit.

IV. The Record Indicates That Since 1976 Respondent DOH Has Considered "Reserved Bed Patient Days" as Being a Subset of "Patient Days"

Respondents contend respondent DOH has never used "reserved bed patient days" in a calculation or function in Medicaid rate setting. The sole function of having "reserved bed patient days" is to inform DOH how many reserved bed days are billed by a particular nursing home; and that DOH's policy of reserving beds for temporarily absent nursing home patients was initially developed as a patient's rights issue (Fargione aff ¶ 12). Without such a policy, patients had no guarantee they would return to a room in the particular nursing home wherein they had been residing.

Respondent DOH further argues that, initially, 10 NYCRR 86-2.8, the regulation regarding "patient days," contained no references to "reserved bed patient days," making no distinction between beds that were physically occupied and beds that were reserved for temporarily absent patients. The legislature amended the regulation in 1982 (1982 amendment) to add subdivisions (d) and (e) which refer to "reserved bed patient days."

Respondent DOH highlights that, in the proposed regulation transmittal packet from the 1982 amendment, the purpose of the changes was stated as " 'housekeeping' changes necessary to maintain consistency with the current RHCF Medicaid reimbursement methodology and to eliminate certain ambiguities and omission in order to provide the public and department with notice of department policies and practices."

This court takes notice of the fact that the proposed regulation transmittal packet from the 1982 amendment never stated that the purpose of distinguishing between a "patient day" and a "reserved patient day" was intended to increase the Medicaid per diem rate paid to health care facilities, or to benefit health care facilities in any manner whatsoever. On the contrary, said packet makes it clear that the only reason the legislature made a distinction between a "patient day" and a "reserved patient day" was specifically for calculating and monitoring the statistics associated with Medicaid reimbursements to nursing homes.

Respondents further contend that, both before and after the 1982 amendment, respondent DOH interpreted "reserved bed patient days" as being a subset of "patient days" in the reimbursement rate calculation process (Fargione aff ¶ 23). In support of this argument, respondents point to various RHCF-4 reports (respondents' mem at 10), including one from 1976, which explicitly states in line "D4" of the report that "reserve bed days [are] included in total" (Fargione aff, exhibit C), clearly demonstrating that respondent DOH has included "reserved bed patient days" as part of "bed days" since at least 1976.

This court declines to question respondent DOH's interpretation of its own policies, especially when such policy has been established for over three decades, and there is overwhelming proof demonstrating the history, credibility and reasonableness behind this policy.

V. The Doctrine of Collateral Estoppel is Inapplicable.

The Court of Appeals has consistently held that two requirements must be met before the equitable doctrine of collateral estoppel may be invoked. The first is that there must be an identity of issue, which was decided in the prior action and is decisive of the present action. The second is that there must have been a full and fair opportunity to contest the decision now said to be controlling (*see Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65, 70 [1969]; *Gilberg v Barbieri*, 53 NY2d 285, 291 [1981]; *Ryan v New York Tel. Co.*, 62 NY2d 494,

500-501 [1984]). The litigant seeking to invoke the benefit of collateral estoppel must demonstrate that the decisive issue was necessarily decided in the prior action against a party, or one in privity with a party (*see Kaufman v Eli Lilly & Co.*, 65 NY2d 449 [1985]; *Matter of Juan C. v Cortines*, 89 NY2d 659, 667 [1997]). The party sought to be precluded from relitigating the issue bears the burden of demonstrating the absence of a full and fair opportunity to contest the prior determination (*see Kaufman*, 65 NY2d at 456; *Matter of Juan C.*, 89 NY2d at 667).

Collateral estoppel, however, is a flexible and adaptable doctrine, and the enumeration of the aforesaid requirements is merely a framework and not a substitute for case-by-case analysis of the facts and realities.

> "In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of what are often competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results. No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings" (*see Staatsburg Water Co. v Staatsburg Fire Dist.*, 72 NY2d 147, 153 [1988]; *Buechel v Bain*, 97 NY2d 295, 304 [2001]; *People v Berkowitz*, 50 NY2d 333 [1980]; *Gilberg v Barbieri*, 53 NY2d 285 [1981]).

Collateral estoppel, as the Court of Appeals has regularly and consistently held, is grounded in concepts of fairness, and courts should not rigidly or mechanically apply this doctrine (*see Matter of Halyalkar v Board of Regents of State of N.Y.*, 72 NY2d 261 [1988]; *D'Arata v New York Cent. Mut. Fire Ins. Co.*, 76 NY2d 659, 664 [1990]).

In the instant matter, petitioners speciously argue that the doctrine of collateral estoppel effectively precludes respondent DOH from contesting petitioners' position, because the first and second requirements of the doctrine have been met, in essence, they contend that it is a rigid doctrine leaving this court no room for flexibility with regard to making a decision. Petitioners woefully mischaracterize the doctrine to their benefit, relying on the alleged preclusive effect of the doctrine as a cornerstone of their argument, thus attempting to avoid the flexible nature of collateral estoppel as propounded in the aforementioned Court of Appeals cases.

The Court of Appeals has consistently held that the doctrine should not be rigidly or mechanically applied, and that a court must engage in an analysis of the facts and realities of each particular case that it addresses. Petitioners are in effect asking this court to disregard these long established concepts, integral to the equitable doctrine of collateral estoppel, instead seeking to have this court rigidly and mechanically apply the two requirements of the doctrine, and precluding respondents from litigating the instant matter. The Court of Appeals holdings in *Staatsburg* and *Jeffreys v Griffin* (1 NY3d 34 [2003]) encourages this court to go beyond rigid and mechanical application, and instead engage in the requisite analysis of the facts and realities of the instant matter before determining whether or not to preclude respondents from litigating the instant matter.

This court must address a number of important, competing policy considerations in order to determine whether collateral estoppel is binding in the instant matter. When this court engages in an analysis of the facts and realities of the instant case, it is clear that one of the competing policy considerations is ensuring that limited governmental resources are allocated in the most efficient and reasonable manner possible.

■ This court must determine whether the public policy consideration of allocating governmental resources efficiently outweighs the policy concerns of ensuring fairness to the parties, conserving judicial resources and the societal interests in consistent and accurate results. While this court recognizes the significant and critical need to ensure these policies, the court is compelled to conclude that they are outweighed by the monumental significance of the aforementioned public policy consideration.

Due to the incredible importance of the facts and realities of this case, and the potential fiscal effect this case will have upon Medicaid, the federal government, New York State Government, Suffolk County Government and the taxpayers who fund them, this court determines that the doctrine of collateral estoppel cannot preclude respondents from litigating the instant matter. A contrary holding would contravene the concept of fundamental fairness underlying the doctrine of collateral estoppel.

■ Thus, this court is driven to the inescapable conclusion that respondent DOH had a rational basis for determining that the Medicaid per diem reimbursement rates it set for petitioners were both reasonable and adequate. Said conclusion was neither arbitrary nor capricious, nor was it outside the scope of

the authority of DOH, nor was it unlawful. Moreover, the Commissioner is entitled to great deference in determining that the reimbursement rates were reasonable. Respondent DOH properly exercised its authority, and the petition herein must therefore be denied in its entirety.

For all the reasons stated herein above and in the totality of the papers submitted herein, it is, therefore, ordered, that the above referenced application of petitioners is hereby denied in all respects; and the petition herein is therefore dismissed and this matter is hereby disposed.