Matter of North Gate Health Care Facility, LLC v Zucker (2019 NY Slip Op 05742)





Matter of North Gate Health Care Facility, LLC v Zucker


2019 NY Slip Op 05742


Decided on July 18, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: July 18, 2019

527612

[*1]In the Matter of NORTH GATE HEALTH CARE FACILITY, LLC, et al., Appellants,
v
HOWARD ZUCKER, as Commissioner of Health, et al., Respondents.

Calendar Date: May 31, 2019

Before: Garry, P.J., Egan Jr., Lynch, Mulvey and Pritzker, JJ.


O'Connell and Aronowitz, Albany (Cornelius D. Murray of counsel), for appellants.
Letitia James, Attorney General, Albany (Frederick A. Brodie of counsel), for respondents.



MEMORANDUM AND ORDER
Mulvey, J.
Appeals (1) from a judgment of the Supreme Court (Cholakis, J.), entered April 23, 2018 in Albany County, which dismissed petitioners' application, in a proceeding pursuant to CPLR article 78, to review determinations of respondents finding that petitioners North Gate Health Care Facility, LLC and Garden Gate Health Care Facility, LLC were overpaid Medicaid funds, and (2) from an order of said court, entered July 19, 2018 in Albany County, which, upon reargument, adhered to its prior decision.
Petitioners operate nursing homes that participate in the Medicaid program. Under that program in New York, respondent Commissioner of Health reimburses nursing homes for care provided to eligible residents by setting per diem rates per patient that are prospective in nature and consider both capital and operating costs (see Matter of Blossom View Nursing Home v Novello, 4 NY3d 581, 585 [2005]). Reimbursement for the operating cost component of health care facilities is based upon allowable operating costs incurred and reported in a base year, with those costs adjusted to account for inflation between the base year and the applicable rate period (see 10 NYCRR 86-2.10, 86-2.12; see generally Public Health Law § 2808). After these rates are established, the rates are subject to audit by respondents to determine whether the costs reported were accurate and, if the audit uncovers discrepancies, respondents will adjust the rates to account for any inaccuracies (see Public Health Law § 32 [14]; 10 NYCRR 86-2.7; 18 NYCRR 517.3, 517.14; 42 CFR 447.253 [g]; see also Public Health Law § 2807 [5]).
In 2006, the Legislature amended Public Health Law § 2808 to change the base years for calculating reimbursement rates, although this change would not be effective until 2009 (see L 2006, ch 109, § 1, part C, § 47 [hereinafter the rebasing law]; Matter of Adirondack Med. Center-Uihlein v Daines, 119 AD3d 1175, 1176 [2014]). However, due to the fiscal crisis in 2009, the Legislature enacted the "scale back law," which essentially reduced expenditures that [*2]the rebasing law would otherwise have mandated (see L 2009, ch 58, § 1, part D, § 2). "This [scale back] law provided that, notwithstanding the rebasing law, or any other contrary provision of law, 'with regard to adjustments to Medicaid rates of payment for inpatient services provided by residential health care facilities for the period April 1, 2009 through March 31, 2010, made pursuant to the rebasing law,' [the Commissioner] was permitted to make proportional adjustments to the reimbursement rates in order to ensure that the aggregate increase in rates did not exceed, nor fall below, $210 million" (Matter of Avenue Nursing Home & Rehabilitation Ctr. v Shah, 112 AD3d 1178, 1180 [2013] [brackets omitted], quoting L 2009, ch 58, § 1, part D, § 2; see Matter of Bronx-Lebanon Highbridge Woodycrest Ctr. v Daines, 147 AD3d 442, 442 [2017]). The last sentence of that statutory section states that "[a]djustments made pursuant to this section shall not be subject to subsequent correction or reconciliation" (L 2009, ch 58, § 1, part D, § 2).
After the federal government granted its approval of the scale back law in 2011 (see 42 CFR 447.256), the Department of Health (hereinafter the Department) informed facility operators, including petitioners, of their rates for periods from April 2009 through June 2011. In 2017, however, respondents informed petitioners that, based on audits that revealed overpayments because certain items reported by petitioners were disallowed, their rates were being reduced for various periods, including May 2009 through December 2011. Petitioners commenced this CPLR article 78 proceeding seeking to annul respondents' determinations to reduce their rates. Supreme Court dismissed the petition. Petitioners appeal from the judgment dismissing their petition and from the court's order granting reargument but adhering to its prior decision.
The primary question on this appeal is whether the last sentence of the scale back law deprives respondents of the power to adjust Medicaid reimbursement rates for the relevant years even where audits disclose inaccuracies in the cost calculations submitted by a facility for its base year. "The text of a statute is the clearest indicator of . . . legislative intent and courts should construe unambiguous language to give effect to its plain meaning" (Matter of Avella v City of New York, 29 NY3d 425, 434 [2017] [internal quotation marks and citation omitted]). The scale back law states, in pertinent part, that "[n]otwithstanding [the rebasing law] or any other contrary provision of law, with regard to adjustments to [M]edicaid rates of payment for inpatient services provided by residential health care facilities for the period of April 1, 2009 through March 31, 2010, made pursuant to [the rebasing law], the [C]ommissioner . . . and the [D]irector of the [B]udget shall, upon a determination that such adjustments, including the application of adjustments authorized by the provisions of [Public Health Law § 2808 (2-b) (g) (the case mix amendment)], shall result in an aggregate increase in total Medicaid rates of payment for such services for such period that is less than or more than [$210 million], make such proportional adjustments to such rates as are necessary to result in an increase of such aggregate expenditures of [$210 million]. . . . Adjustments made pursuant to this section shall not be subject to subsequent correction or reconciliation" (L 2009, ch 58, § 1, part D, § 2).
Under a plain language interpretation, the phrase "[a]djustments made pursuant to this section" means adjustments made pursuant to the scale back law. As the parties agree, it would be untenable to recalculate the rates for every nursing home in the state to arrive at a new proportional adjustment. Thus, once proportional adjustments were made under the scale back law, that determination was final. However, that law did not prohibit all rate adjustments concerning the relevant time period, regardless of the purpose. Nor did the scale back law state or imply that the Legislature intended to deprive the Office of the Medicaid Inspector General of the authority to conduct audits or adjust Medicaid reimbursement rates based on information revealed in audits. Rather than exclude, or remain silent regarding, audits as part of the omnibus budget bill that contained the scale back law, the Legislature noted that it was encouraging and commending auditing efforts in order to address fraud and abuse in the Medicaid system and erroneous overpayments to health care facilities (see 2009 Yellow Book: Statistical and Narrative Summary of the Executive Budget — Fiscal Year April 1, 2009 to March 31, 2010 at 12 [December 2008]; NYS Division of Budget, 2009-2010 — Enacted Budget Gap Closing Plan — Healthcare, available online at https://
www.budget.ny.gov/pubs/archive/fy0910archive/enacted0910/0910enactedInitiatives/0910enacted-healthCare.html). It would be anomalous for the Legislature to reduce Medicaid reimbursement rates for all nursing homes for fiscal reasons but, at the same time, prevent reduction of rates for individual nursing homes based on fraud or miscalculations [FN1]. Respondents are required by federal law to conduct periodic audits (see 42 CFR 447.253 [g]), and all rates are deemed provisional until an audit is performed and completed, at which time such rate may be adjusted (see 10 NYCRR 86-2.7; see also 18 NYCRR 517.14 [providing that "[a]udit adjustments which result in rate revisions must be applied to all rate periods which are affected by the audited costs"]).
This interpretation of the scale back law is consistent with our decision in Matter of Avenue Nursing Home & Rehabilitation Ctr. v Shah (112 AD3d 1178 [2013], supra). In that case, we approved the Department's adjustment of Medicaid reimbursement rates, during the period covered by the scale back law, based on a banking adjustment reflecting the actual rate of inflation (id. at 1180). This Court "reject[ed the] petitioners' contention that the scale back law provided for an aggregate increase to the Medicaid reimbursement rates which was not subject to any further adjustments" (id. at 1181). We concluded that "[t]he plain language of the scale back law substantively applies only to those adjustments made pursuant to . . . the rebasing law," and that such "language indicates that the Legislature intended to limit the increase in costs attributable to rebasing" (id. [internal quotation marks and citation omitted]). We now similarly reject petitioners' argument that the scale back law prohibits any adjustments other than those specifically included therein, namely, the proportional adjustments required to make the aggregate rebasing increases for all nursing homes statewide equal to $210 million.
Petitioners contend that the audit adjustments were punitive and unfair because petitioners were subject to higher proportional adjustments under the scale back law based on the higher rates, which were later lowered. Notably, neither of the adjustments were penalties; they were authorized reductions based on either a statute or a regulatory audit process. Although it appears that petitioners would have received lower scale back adjustments if those adjustments were based on post-audit rates, petitioners are responsible for the higher rates, as those rates were calculated based on petitioners' own reporting of their operating costs, in which they included disallowed items (as later revealed in the audits). So, although petitioners may have been subjected to a percentage scale back reduction based on higher rates than what they eventually received, this is not particularly unfair given that the fault does not lie entirely with respondents. Moreover, the two adjustments were not duplicative because the scale back adjustments effected an industry-wide reduction and the audit adjustments corrected miscalculations for each petitioner individually.
Garry, P.J., Egan Jr., Lynch and Pritzker, JJ., concur.
ORDERED that the judgment and order are affirmed, without costs.



Footnotes

Footnote 1: Although petitioners were not accused of any fraud or unscrupulous behavior, the audit found that petitioners had included numerous disallowed items when calculating their operating costs; petitioners are not challenging those audit findings. Hence, petitioners are implicitly conceding that — absent their interpretation of the scale back law — their rates could be reduced based on the audit results. Respondents have an obligation to ensure that reimbursement rates are accurate and to prevent even inadvertent miscalculations that may improperly increase such rates.